IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BRENT JASON MORIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:14-cv-000769-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Brent Jason Morin appeals the Commissioner of Social Security's final decision denying his application for disability and disability insurance benefits under Title II of the Social Security Act. The decision is affirmed.

**I.     Background**

Morin was born in 1965. He alleges he became disabled on April 19, 2011 when he had a brain stem stroke. The Administrative Law Judge held a hearing on May 1, 2013 and denied Morin's application on May 17, 2013. The Appeals Council denied Morin's request for review. The relevant alleged disability period for purposes of the present appeal is April 19, 2011 through May 17, 2013.

**A.     Medical history**

Morin went to the emergency room on April 19, 2011 with altered coordination, difficulty swallowing, numbness, weakness, and trouble talking. A neurologist assessed ataxia secondary to medullary and pontine infarction, dizziness with any head movements, a history of migraines, and anxiety. During his hospitalization, Morin's upper extremities were observed to have full range of motion with some difficulty with finger-to-nose coordination on the right side.

His lower extremities moved well at all joints and he had no sensory deficits. He had difficulty swallowing, due to suspected muscle fatigue, and was given swallowing therapy to rebuild the muscles. He also had restorative physical therapy for balance and gait training. Morin's rehabilitation potential was considered good. He was discharged to his mother's home after seven days, and subsequently had about ten sessions of outpatient therapy.

In May 2011, Morin saw his treating neurologist, Mignon Makos, M.D. The doctor assessed Morin as doing well, with residual facial numbness and tingling on the left side, and unsteadiness and weakness on the right side. Morin complained of vertigo that was slowly improving and a headache lasting two days the prior week. His physical examination was normal, with the exception of walking quickly and drifting toward the left. His muscle strength was rated 5/5, and his reflexes were normal at 2/2. His therapy for swallowing was continued. Dr. Makos also prescribed Warfarin for dissection of the vertebral artery, pantoprazole for esophageal reflux, and Lortab for headaches.

Morin saw his primary care doctor, Janice Goddard, D.O., several times in June 2011. On June 10, he said he was feeling better. [Tr. 254.] He said he still had some difficulty swallowing, but it was better; he was able to walk normally; and he could ride his bicycle, with only some balance trouble when getting off of the bicycle. On June 14, he saw Dr. Goddard for protime monitoring. The doctor noted that Morin's employer wanted him to return, and Morin did not feel he could, but "feel[s] at some point in the future he might be able to return to work working short days." [Tr. 256.] Morin saw Dr. Goddard again on June 20 for protime monitoring. Morin did not complain of migraine on June 10, 14, or 20. On June 30, Morin told Dr. Goddard that he had had a headache for two days over the weekend, which the doctor noted as "now resolved," and had esophageal burning after eating, but was eating more. Dr. Goddard recommended Morin try eating fewer smaller meals and return in one month.

At a July 2011 visit with Dr. Goddard, Morin reported continued numbness on his left side and weakness on his right side. Dr. Goddard recommended he make a list of questions for when he next saw his neurologist. He did not complain of migraine.

Morin saw his neurologist, Dr. Makos, in July 2011, for follow up. The doctor noted in the chart:

> <u>Patient words</u>: This is a 46 year old male who is seen in follow up for a brainstem infarct presumed secondary to a right vertebral artery dissection manifested by dysphagia and gait instability. He has been doing well. Since his last visit, he has been on a canoe trip. <u>Except for finances, he has never felt better in his life. He used to have severe headaches but now, he may only get them once a month and the severity is a 3/10.</u> He remains off work. He recalls that about a month prior to his stroke that he was hit in the back of his head with a door. He is waking up in the night, sometimes unable to swallow, awakening drowsy. He has had heartburn. He has not been taking the Pantoprazole and he has been perspiring easily.

[Tr. 390, emphasis added.] His gait was observed to be normal, but he still walked quickly and tended to drift to the left. The neurologist adjusted Morin's anticoagulation therapy, and continued Vicodin, for one month, and Pantoprazole. The doctor and Morin had a "long discussion" about Morin returning to work. [Tr. 392.] Dr. Makos offered to order a sleep study, but Morin refused because he did not want to use a CPAP machine.

In August 2011, Morin told Dr. Goddard that his neurologist had said he could go back to work, and that he was scheduled to go back on September 1, 2011. But Morin told Dr. Goddard he did not know if he was ready to perform his regular job. Dr. Goddard noted, "[Morin] thinks he is getting better with time." [Tr. 266.] But Dr. Goddard noted Morin still occasionally stumbled when he walked, did not yet have much feeling on the left side, was concerned about his endurance level, and easily sweated. Morin planned to get a second opinion from another neurologist, but that neurologist could not see him until at least mid-September, so Morin

3

planned to talk to his employer about doing a light-duty job. Dr. Goddard noted in the chart that Morin could do a desk job or a job that was less physically demanding. [*Id.*]

Morin saw neurologist Yunxia Wang, M.D., in October 2011. The doctor ordered a C.T. scan of Morin's neck and head, and the results were unremarkable. Dr. Wang diagnosed acute but ill-defined cerebrovascular disease, and did not opine about any limitations on Morin's ability to work.

In November 2011, Morin had a comprehensive functional capacity evaluation with an occupational therapist, Kelli Reiling. He demonstrated bilateral upper extremity strength within normal limits, and his grip and pinch strength was within norms for age and gender or exceeded norms for age and gender. He reported being able to complete, without difficulty or increased symptoms, activities of daily living of getting in and out of bed, toileting, sink activities, bathing, showering, shaving, dressing, preparing meals, washing dishes, cleaning, vacuuming, dusting, sweeping, washing clothes, handling groceries, mopping, sitting, walking, working at a desk, watching television, and child care. He reported being able to complete, with some difficulty or increased symptoms, activities of sleeping, making the bed, and getting in and out of a car. Activities he avoided, due to difficulty or increased symptoms, were gardening, painting, raking, mowing, shoveling, car maintenance, cutting wood, and fishing. Morin reported that he had not fallen since June 2011, he drives a car, and his pain in the past 30 days ranged from a 1/10+ on his best day and 10/10 on his worst day, attributable to having a headache. Morin demonstrated functional capacity equivalent to a medium- to heavy-demand level, but Ms. Reiling noted his job as a material handler and truck driver required him to perform at the extra-heavy level.

At subsequent visits with Dr. Goddard, Morin's anticoagulation therapy continued to be monitored. He was also treated for an upper respiratory infection beginning in February 2012. His symptoms included congestion and headache. On March 12, 2012, he was still on an

4

antibiotic and taking Zyrtec, and complained of a bad headache for which he was also taking Vicodin. He was given prednisone for his respiratory symptoms. On March 19, 2012, he saw Dr. Goddard about a knot on his leg, because he was concerned about a blood clot. He did not report headache. The doctor noted that prednisone was helping Morin's breathing, and prescribed more. In April 2012, Morin saw Dr. Goddard, reporting trouble breathing. He said he did well for a month after taking prednisone and then began having problems again. He did not report headache.

Dr. Goddard filled out a two-page "Medical Source Statement" form in August 2012. [Tr. 439-440.] The doctor marked that Morin could sit six hours or more, and stand or walk a total of one hour, in an eight-hour work day. She noted he could occasionally reach, handle, and finger; lift or carry less than ten pounds; and bend, squat, stoop, climb, and reach above shoulder level. In response to the question, "If pain is a factor, to what level does it affect patient?", Dr. Goddard checked "markedly." [Tr. 440.] In response to the question, "If fatigue is a factor, to what level does it affect patient?", she checked "severely." [*Id.*] In the space provided at the end of the form for explanation of "Objective findings supporting above limitations," Dr. Goddard wrote:

> Altered sensations on left side of body. Falls when going down stairs. Cannot tell hot [and] cold. Numbness left side of body.

[*Id.*] The doctor listed no other limitations on the form, and provided no other explanation in support for the limitations she did identify. The ALJ gave the opinion little weight, on the basis that Morin testified about fatigue and numbness, not pain, and his activities of daily living and July 2011 canoe trip demonstrate Morin is capable of performing more than sedentary work. [Tr. 21-22.]

In December 2012, Morin complained to Dr. Goddard of having one or two headaches a week, and the doctor changed his Vicodin prescription to another medication. [Tr. 452.] In

5

January 2013, Dr. Goddard switched Morin's pain medication back to Vicodin. [Tr. 461.] On February 25, 2013, Morin complained of headache in the frontal region, which Dr. Goddard noted was "suggestive of sinus pressure." [Tr. 463.] She noted his nasal mucosa and turbinates were swollen, "consistent with allergic rhinitis." [Tr. 464.]

### B. Morin's testimony

At the May 2013 hearing, Morin testified that he was disabled and could not work due to migraine headaches causing him to be bedridden about once or twice per month. He said the migraine headaches caused pain and dizziness. He said he had experienced migraine headaches before his April 2011 stroke, but they became significantly worse after the stroke. Morin also described issues with fatigue. He testified that the most he could lift and carry was a gallon of milk, or five-pound bag of sugar. He stated that he could walk three to four blocks before needing to stop and rest. Morin described numbness in the left side of his body, and said he sometimes "fall[s] down the stairs" due to numbness and not knowing where his foot was on the stairs. [Tr. 44, 48] Although he had needed a walker or a cane after his stroke in April 2011, he admitted he was able to stop using them before the end of 2011. Morin had a driver license, drove about twice a week, and had driven 75 miles to attend the administrative hearing.

Morin received unemployment insurance benefits after April 19, 2011. He admitted he was required by the State to be looking for work in order to receive these benefits, and that he had actively searched for work during the time period he claimed to be disabled, filing job applications both in person and on line. [Tr. 36.] He applied for "[a]nything and everything" during his job search, including jobs at a dry cleaning store, retail clothing business, a hardware store, and a home and garden store, and as a truck driver. [*Id*.] He last applied for a job about six months before the May 2013 administrative hearing. [*Id*.]

Morin lived in a two-story house with his bedroom located upstairs. On a regular basis,

Morin did his dishes, cooked, and did his laundry. He did some cleaning, such as vacuuming. Morin stated that he went on a canoe trip in July 2011, but had not gone on any similar trips since then.

### C. The ALJ's decision

The ALJ found that during the relevant period, Morin had severe impairments of medullary infarct secondary to right vertebral artery dissection, and migraine headaches. Morin did not claim to meet any Listings, and the ALJ did not find that he met any.

The ALJ found Morin has the residual functional capacity to perform:

> [L]light work as defined in 20 CFR 404.1567(b) and SSR 83-10 in that the claimant can do the following: occasionally lift twenty pounds and frequently lift ten pounds; stand and walk up to six hours, and sit for up to six hours; occasionally climb ramps and stairs but never climb ladders, ropes, scaffolds, or balance; frequently handle and frequently finger with the left; be exposed to no more than moderate noise; needs to avoid all exposure to excessive vibration; and needs to avoid operational control of moving machinery, unprotected heights, and hazardous machinery.

[Tr. 16.] The ALJ found Morin's allegations of totally disabling, medically determinable impairments not entirely credible. [Tr. 19.]

The ALJ determined Morin was not capable of performing past relevant work, but was capable of performing other jobs that exist in significant numbers in the national economy, such as retail marker, inserting machine operator, and bench assembler.

## II. Discussion

Morin argues that the ALJ's credibility finding is unsupported by the record as a whole; the ALJ did not give good reasons for discounting the August 2012 opinion of Dr. Goddard, Morin's primary care doctor; and the ALJ did not take into account all relevant evidence in formulating the RFC, specifically, Morin's need for routine monitoring of his blood-thinning medication.

7

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. The credibility finding

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). When an ALJ determines a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). An ALJ may discount a claimant's complaints if they are inconsistent with the record as a whole. *Wildman v. Astrue,* 596 F.3d 959, 968 (8th Cir. 2010) *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). A reviewing court normally defers to an ALJ's credibility finding if the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (citation omitted), and when substantial evidence on the record as a whole supports the credibility finding, *Peña v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996).

Morin testified that he is disabled due to migraines, fatigue, and numbness on the left side

of his body that caused him to fall. Addressing the *Polaski* factors, the ALJ noted Morin's past work record was good, but numerous other factors detracted from his credibility. Morin's daily activities are inconsistent with his claim of totally disabling impairments. Morin admitted to the occupational therapist in November 2011 that he had no difficulty in daily activities of getting in and out of bed, toileting, sink activities, bathing, showering, shaving, dressing, preparing meals, washing dishes, cleaning, vacuuming, dusting, sweeping, washing clothes, handling groceries, mopping, sitting, walking, working at a desk, watching television, and child care. He drives a car. He went on a canoe trip in July 2011. Morin testified that his numbness caused him to fall on the stairs at his house. But he told the occupational therapist in November 2011 that he had not fallen since June 2011. Furthermore, he was using a walker when he left the hospital after his stroke in April 2011, but he graduated to a cane, and then by the end of the year needed no support to ambulate. *See McDade v. Astrue,* 720 F.3d 994, 998 (8th Cir. 2013) (The ALJ's reasons for discounting the claimant's credibility were supported by the record as a whole when, among other factors, the claimant "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with an electric cart.")

The record relating to duration, frequency and intensity of pain, and functional restrictions, does not support Morin, either. Morin testified that he has migraines once or twice a month, they last two days at a time, and he is unable to leave the house when he has them. He testified that although he has had migraines most of his life, they are worse since the stroke, and the medications he can take for migraines while still on Warfarin do not work as well as the ones he took before. On the other hand, he saw his primary care doctor, Dr. Goddard, four times in June 2011. He reported feeling better, that he could ride a bicycle, and that he thought he could return to working short days at some point in the future. Furthermore, at the fourth visit, he

9

reported having had a two-day headache the weekend before, which the doctor simply noted as resolved. Three months after having his stroke, in July 2011, he told his neurologist that he "had never felt better in his life." [Tr. 390.] He also said his headaches had once been severe, but he was getting them once a month and the severity was 3/10. In August 2011, he told Dr. Goddard that he thought he was getting better with time, and would talk to his employer about working, and the doctor noted Morin had the ability to work at a desk job or one physically less demanding. The neurologist whom Morin saw in October 2011 for a second opinion, relating to his readiness for returning to work, did not note any limitations related to headache. When Morin saw Dr. Goddard in 2012 and 2013, he failed to consistently complain of headache, and at two visits, the doctor related his complaints of headache to respiratory infection or sinus symptoms.

Furthermore, during the relevant period, Morin applied for and received unemployment benefits. He admitted that a requirement to receive such benefits is that he actively looks for work, and that he did actively look for work, as recently as six months before the administrative hearing. He applied for a wide variety of jobs in person and on line, including jobs at a dry cleaning store, retail clothing business, hardware store, and home and garden store, and as a truck driver. "Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an unemployment applicant 'must hold himself out as available, willing and able to work.'" *Smith v. Colvin,* 756 F.3d 621, 625 (8th Cir. 2014) (*quoting Jernigan v. Sullivan,* 948 F.2d 1070, 1074 (8th Cir. 1991)). Morin's "record of contemplating work indicates" Morin "did not view his pain as disabling." *See Barrett v. Shalala,* 38 F.3d 1019, 1024 (8th Cir. 1994).

The ALJ considered the *Polaski* factors in assessing the credibility of Morin's claims. Furthermore, the above discussion reflects that the credibility determination is supported by

10

substantial evidence on the record as a whole. Morin's arguments, if accepted, might support a different conclusion, but they would not constitute grounds for setting aside the ALJ's credibility determination.

Therefore, the ALJ's credibility determination will not be disturbed.

## B. Weight given Dr. Goddard's opinion of August 2012

Morin argues that the ALJ did not properly evaluate Dr. Goddard's opinion of August 2012, and should have given the opinion more than "little weight."

The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 2015 WL 3396586, at *5 (8th Cir. May 27, 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh,* WL 3396586, at *5 (*citing Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)). The opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). The ALJ "may discount or even disregard the opinion … where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id*. (*citing Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)). *See also Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (treating physician's opinion appropriately afforded less weight when inconsistent with clinical treatment notes).

Dr. Goddard's two-page opinion of August 2012, provided in checklist form, notes

11

physical limitations on Morin's ability to sit, stand, walk, reach, handle, finger, lift, carry, bend, squat, stoop, climb, and reach above shoulder level. The doctor checked off "markedly" in response to the question of how pain affects the patient, and "severely" in response to the question of how fatigue affects the patient. [Tr. 440.] The only narrative explanation the doctor provided concerned diminished sense of touch: "Altered sensations on left side of body. Falls down when going down stairs. Cannot tell hot [and] cold. Numbness left side of body." [*Id*.] The doctor noted no clinical findings or other supporting records regarding pain, or any other limitation she checked off.

Morin essentially reads the "marked[]" effect of "pain" as a limitation the ALJ failed to properly account for, especially with regard to headache pain. But Dr. Goddard's remark is at best conclusory. The doctor does not identify the source of the pain she refers to. The narrative provided does not explain what she meant concerning marked effect of pain. The narrative is in fact inconsistent with any marked effect of pain, in that the doctor addresses diminished sense of touch.

Furthermore, the opinion is not supported by medically acceptable clinical and laboratory techniques, consistent with the other substantial evidence in the case record, or consistent with the treatment records Dr. Goddard kept. In the first few months following his stroke, Morin reported to Dr. Goddard that he felt better. He did not consistently report headache pain to Dr. Goddard in that time frame, nor do the records reflect complaints of other kinds of pain for which he was treated. In August 2011, Morin told Dr. Makos he had never felt better in his life, and while his headaches had been "severe," he was getting headaches only once a month at a severity of 3/10. [Tr. 390.] In view of the improvement, Dr. Makos told Morin he was ready to go back to work. Dr. Wang, the neurologist from whom Morin obtained a second opinion in October 2011 in relation to returning to work, did not note anything about any kind of pain, let

alone any limitations related to any kind of pain. The following month, November 2011, Morin told an occupational therapist that he in fact had had pain—due to headache—in the last 30 days, in severity ranging from 1/10 to 10/10. Even if that self-report is accepted as true, Morin's record of visits with Dr. Goddard in 2012 and 2013, discussed above in relation to the credibility analysis, are not consistent with any opinion that Morin had disabling pain that persisted or could be expected to persist for 12 month, inasmuch as Morin did not consistently report and receive treatment for pain, nor did Dr. Goddard not any limitations caused by pain. *See* 42 U.S.C. § 423(d) (to establish entitlement to benefits, a claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of 12 months); and *Hensley v. Barnhart,* 352 F.3d 353, 357 (8th Cir. 2003) (a lack of significant functional restrictions imposed by treatment providers is inconsistent with allegations of disabling limitations).

Further undermining Dr. Goddard's opinion is that it is inconsistent with Morin's activities, including that he was actively looking for work, could ride a bicycle, drives a car, took a canoe trip three months after his stroke, and lived in a two-story house in which he occupied an upstairs bedroom. *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) (rejecting limitations found by treating physician where the claimant's "activities of daily living do not reflect" them); *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (rejecting conclusory statements in treating physician's letter stating that the claimant "cannot sit for a long period of time without getting up to move around," and that "it [would be] almost impossible for him to hold a full time job"; statements were contradicted by claimant's testimony at the administrative hearing that he was currently employed as a school bus driver).

Whether, as Morin argues, the ALJ incorrectly perceived inconsistency between Dr. Goddard's opinion regarding the effect of Morin's pain on his functioning, and the record,

13

[Doc. 14, p. 13], Morin was not prejudiced. Substantial evidence on the record as a whole supports the ALJ's decision to give the opinion little weight, for the reasons discussed above. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (citations omitted) (reversal is necessary only if the failure prejudices the claimant); *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome).

In view of the foregoing, the Court will not disturb the ALJ's decision to give little weight to Dr. Goddard's August 2012 opinion.

### C. Formulation of the RFC

Finally, Morin argues that the RFC fails to account for his alleged need to be absent from work more than once per month due to medical appointments.

Residual functional capacity is what a claimant can still do despite physical or mental limitations, and should take into account the effects of treatment a claimant receives, including frequency and disruption to routine. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). A claimant has the burden to prove his or her RFC at step four of the sequential evaluation. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Thus, an ALJ's failure to include certain limitations does not require reversal if there is no evidence that the "conditions impose any restrictions on [the claimant's] functional capabilities." *Owen v. Astrue,* 551 F.3d 792, 801 (8th Cir. 2008).

Morin points to the testimony of the vocational expert, who stated that the jobs identified would generally tolerate one sick day per month. [Doc. 14, p. 16; Tr. 55.] He argues that after his discharge from the hospital in April 2011, "the frequency of his treatment has averaged 1.5 visits per month." [Doc. 16, p. 4.] But, he continues, the ALJ failed to factor the frequency of

14

his medical appointments into the RFC formulation, and remand is therefore required.

Morin did not provide any evidence at the hearing regarding the number of work days per year he would be required to miss due to medical treatments. Furthermore, the average of 1.5 visits per month that Morin provides in his briefing includes the period immediately following his hospitalization for stroke, when Morin appears to have had more frequent medical contacts than he did later.

Nevertheless, simply because a claimant requires regular healthcare appointments does not necessarily mean he cannot work on the days he has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the claimant would need to miss an entire work day for an appointment. *See Barnett v. Apfel,* 231 F.3d 687, 691 (8th Cir. 2000).

It was Morin's burden to show the frequency of his healthcare appointments and any disruption they would cause, and he did not meet it. Accordingly, the RFC determination will not be disturbed.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 18, 2015
Jefferson City, Missouri